UNITED STATES of America, Plaintiff-Appellant,

v.

Sheryl HUNTER and Ezell Allen, Defendants-Appellees.

No. 76–1631.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 15, 1976.

Decided March 4, 1977.

Philip M. Van Dam, U. S. Atty., Loren G. Keenan, John Conley, Detroit, Mich., for plaintiff-appellant.

Lonnie Smith, Detroit, Mich., for Hunter.

Charles D. Lusby, Detroit, Mich., for Allen.

Before PECK and ENGEL, Circuit Judges, and MILLER, Associate Judge.*

PECK, Circuit Judge.

Defendants were indicted for possession of the controlled substance heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1).[1] Upon a motion made by the defendants, the district court suppressed as evidence the heroin seized in the course of a search conducted at the Detroit Metropolitan Airport by agents of the Drug Enforcement Administration. The district court suppressed the evidence as to defendant Hunter because the federal agent did not have probable cause for her warrantless arrest. Thus the subsequent warrantless search of defendant Hunter, which produced the heroin, was in violation of her Fourth Amendment right to be free from unreasonable search and seizure. The district court suppressed the evidence as to defendant Allen because the Court found that defendant Allen had automatic standing under *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), as one charged with constructive possession of the heroin, to contest the illegal search of and seizure of evidence from co-defendant Hunter. The United States appeals.

We hold that the district court correctly determined that there was not probable cause to arrest defendant Hunter, and thus we affirm the district court order to suppress the heroin evidence as to her. We also hold, however, that the district court erred in granting standing to defendant Allen on the authority of *Jones, supra*, to contest the illegal search of defendant Hunter, and we reverse the district court order suppressing the heroin evidence as to defendant Allen.

I

The case arose out of a continuing surveillance of the Detroit Metropolitan Airport by the federal Drug Enforcement Administration (DEA) in co-operation with local authorities. On July 28, 1975, a Detroit Metropolitan Airport security officer was interviewed by Wayne County, Michigan, Sheriff's Department Investigator Willie L. Heath and DEA Special Agent Thomas Dykstra. The airport security officer told the two agents that two male passengers had passed her security checkpoint carrying a briefcase filled with currency. The contents of the briefcase had been discovered when the security officer opened the briefcase after the security x-ray machine had shown the case to contain an unidentified large mass. The airport security officer also said that the two passengers were taking a flight to Los Angeles.

This information was relayed to DEA Special Agent Paul Markonni. He checked on the two passengers and discovered that they were travelling under the name "C. Williams" and "E. Allen." The phone number left with the airline was listed to a Rozert Jackson, who was on file at the Detroit office of the DEA as "James Clark." The "Clark" file contained information on men who matched the descriptions of the two men who had taken the flight to Los Angeles.

---

* The Honorable Jack R. Miller, United States Court of Customs and Patent Appeals, sitting by designation.

1. 21 U.S.C. § 841(a)(1):
 (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

 (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance
 . . . . .

Markonni then contacted the Los Angeles Regional Office of the DEA. He requested that the Los Angeles office maintain surveillance of the two men. A few days later, the Los Angeles office reported back to Markonni that the requested surveillance of the two men had been conducted. The surveillance showed that the two men were driven from the Los Angeles airport to the home of a "documented" narcotics trafficker and then to the home of a large scale narcotics dealer. After receiving this information, Markonni contacted the Detroit Police Department. He learned that a "C. Williams" had been previously arrested twice for violations of Michigan State Narcotics Law. Plans were made to meet the two men on their return to Detroit.

On August 4, 1975, Markonni learned that a "C. Williams" and a "J. Hill" (another name in the "James Clark" file) were scheduled to return. At the Detroit Metropolitan Airport early on the morning of August 5th, Markonni looked in vain for the two men, but he did see one of the two men for whom he was looking. The man was with a female companion. Markonni approached the couple as they were entering a taxicab and asked for identification. The two produced driver's licenses showing the man to be Ezell Allen and the woman to be Sheryl Lynn Hunter. Markonni then asked to see their airline tickets. Allen produced two coupons in the names of "C. Williams" and "J. Hill." Markonni asked the two to accompany him to the American Airlines Baggage Claim Office where he told them they were under arrest. A search of the defendants followed. About 280 grams of heroin were found sewn in defendant Hunter's girdle. No narcotics were found on defendant Allen.

## II

 The Supreme Court has laid down the standard for determining probable cause:

> Whether [an] arrest [is] constitutionally valid depends upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.

*Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964). See *Carroll v. United States,* 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925); *United States v. Edwards,* 474 F.2d 1206, 1208 (6th Cir. 1973), *rev'd other grounds,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). The determination as to whether this standard is met is "an act of judgment formed in light of the particular situation and with account taken of all the circumstances." *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949); *United States v. Edwards, supra,* 474 F.2d at 1208. Guiding this act of judgment, according to *Beck v. Ohio, supra,* 379 U.S. at 91, 85 S.Ct. at 225, and *Brinegar v. United States, supra,* 338 U.S. at 176, 69 S.Ct. at 1311, is the recognition that:

> [t]he rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating . . . often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

 The district court correctly found that there was not probable cause to arrest defendant Hunter and hence the search of her was in violation of her Fourth Amendment right to be free from unreasonable search and seizure. For purposes of determining probable cause, all that Agent Markonni knew or could validly infer was that defendant Hunter was in the company of defendant Allen at the Detroit Metropolitan Airport; that defendant Allen had flight coupons in the names of persons suspected of narcotics violations; and that defendant Hunter had used one of the flight coupons that defendant Allen produced for Markonni's inspection. It cannot be said that in

light of these circumstances that Agent Markonni had sufficient facts to warrant a prudent man in believing that the defendant Hunter had committed or was committing an offense. Law enforcement would not have been unduly hampered to wait in order to obtain more facts before seeking to arrest her. To find probable cause in this situation would leave law-abiding citizens at the mercy of officers' capriciousness.

The Government contends that the district court erred in not holding that defendant Hunter was initially stopped for an investigative stop permissible under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It is obvious, however, that *Terry* cannot justify Markonni's arrest and search of defendant Hunter.

*Terry* upheld the propriety in certain situations of an intermediate police response short of arrest in "street" confrontations with individuals. In *Terry*, a police officer patrolling a street observed three persons studying a store in a way that caused him to suspect that the three individuals were "casing" the store for a robbery attempt. He approached the men and made inquiries. Not satisfied by their response and fearing that the men might be armed, the officer grabbed one of the men and patted him down for weapons. The frisk indicated that the man was carrying a concealed weapon. The officer then ordered the three men inside the store and patted down the other two men, finding another weapon on one of them. The Supreme Court held that the police officer's actions did not violate the Constitution because such an investigatory stop and frisk for weapons did not require the probable cause needed for arrest but required only the suspicion that would warrant a man of reasonable caution in believing that criminal activity was being planned or was occurring.

In the present case even had Agent Markonni had the reasonable suspicion necessary to conduct an investigatory stop of defendant Hunter, what followed the initial stop was clearly beyond the purview of *Terry*. First, the present case involved an arrest, whereas *Terry* concerned only an investigative stop. When Markonni took defendant Hunter into the airport office, he placed her under arrest without probable cause. The Government argument that there was only a limited detention of the defendants ignores the facts. *Terry* became irrelevant once the arrest was made. Second, the present case involved a full search, whereas *Terry* was limited to a frisk for weapons. Markonni made a search that only a full arrest could possibly justify, detailed enough to discover heroin sewn in a girdle. In *Terry*, the police officer limited his search to a pat-down for weapons without even reaching inside the coats of the individuals until he felt the weapons.

The Government points to the border search cases of *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), and *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), as support for their application of *Terry* to the present case. Those cases, however, offer no support whatsoever for the Government's argument.

*Almeida-Sanchez* held that without consent given by an individual, probable cause was necessary in order to make a warrantless search of an automobile twenty-five miles north of the Mexican border. No probable cause was found in the case because the only basis for suspicion was the fact that the driver of the car appeared to be of Mexican descent.

*Brignoni-Ponce* did uphold under *Terry* the legality of the roving border patrol to stop vehicles near the Mexican border and question occupants about citizenship and immigration status when the only ground of suspicion was that the driver and occupants were of Mexican ancestry. In allowing the questioning as constitutionally permissible, the Court balanced the strong Government interest in handling the problem of illegal entry of aliens against the modest interference with individual rights and did the balancing in view of the extreme difficulty of patrolling the border. *Brignoni-Ponce* thus cannot be said to be authority for warrantless arrests made

without probable cause and warrantless searches of debarking passengers at an airport.

Neither is *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), which might be read as an extension of *Terry,* of any assistance to the Government's argument. In *Adams,* a police officer acted on an informant's tip that the driver of an automobile had a gun in his waistband. The officer approached the car and asked the driver to open the door. After the driver opened the window instead, the officer reached into the car to seize the gun from the driver's waistband. The Supreme Court held that the officer's actions did not violate the driver's Fourth Amendment rights.

*Adams* went no further, however, than to support the proposition that under *Terry* "the policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." 407 U.S. at 146, 92 S.Ct. at 1923. As the *Adams* Court noted, the purpose of a *Terry* frisk for weapons is "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." 407 U.S. at 146, 92 S.Ct. at 1923. The intention of Markonni's search was to discover evidence, and he did not need to make the search in order to protect himself from attack.

The farthest that the *Terry* stop and frisk principle has been extended in this Court is in *United States v. Dalpiaz,* 494 F.2d 374 (6th Cir. 1974). There, the defendant was convicted of attempting to board an aircraft with concealed and dangerous weapons, and on appeal he urged that his motion to suppress evidence taken in a search at the airport was improperly denied. The defendant had gone through the airport's security check in possession of a gun and a knife with a large blade, and he had also activated the metal detector three times. This Court decided that the airport security officer could under *Terry* justifiably conduct a limited search by asking the defendant to empty his pockets. We recognized that the search involved something other

than the pat-down which occurred in *Terry* and that the officer was not in fear for his own safety. However, we concluded that in the special context of airport security measures taken to prevent hijacking, the limited search was justified because the security officer had the duty of protecting the nearby passengers and members of the public using the airport facilities.

*Dalpiaz* referred to *United States v. Moreno,* 475 F.2d 44 (5th Cir.), *cert. denied,* 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973), for an account of the special dangers and problems of detection involved in air piracy. In *United States v. Moreno, supra,* and *United States v. Legato,* 480 F.2d 408 (5th Cir.), *cert. denied,* 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973), the Fifth Circuit used *Terry* to justify warrantless searches at an airport, made without arrests based on probable cause, of individuals who were not embarking passengers but who were feared to be hijackers. Like *Dalpiaz, Moreno* and *Legato* were concerned with the dangers to the public of air piracy as well as the detection problems. Unlike *Dalpiaz, Moreno* and *Legato* involved more thorough searches of individuals who had not voluntarily gone through an airport security check but who only showed behavior in the terminal sufficiently suspicious to warrant a *Terry* stop. Consequently, *Moreno* and *Legato* required a greater extension of *Terry* than did *Dalpiaz.*

Without debating the soundness of *Moreno* and *Legato,* which this Court did not discuss in *Dalpiaz,* the special concerns about air piracy expressed in all three opinions do not exist in the present case. First, law enforcement officers in *Dalpiaz, Moreno,* and *Legato* were faced with the necessity of acting immediately at the airport to protect the public. Agent Markonni was not faced with that problem. Second, the officers in *Dalpiaz, Moreno,* and *Legato* were searching for weapons or explosives, just as the officer in *Terry* was frisking for weapons. In the present case, Agent Markonni was searching for evidence of crime not presenting the immediate danger of weapons or explosives. Third, the officers

in *Dalpiaz, Moreno*, and *Legato* were faced with what those cases agree are the "unusual detection problems" of air piracy, *United States v. Moreno, supra*, 475 F.2d at 49, potentially requiring in some cases that an officer take steps with regard to a suspected hijacker that are not confined to a pat-down for weapons. With the present case, the same degree of concern as to the difficulty of detecting narcotics violations cannot be said to be present.

*Dalpiaz, Moreno*, and *Legato* do not offer support for the actions of Agent Markonni in the present case. Given the special concerns of air piracy, the limited search in *Dalpiaz* in no way approaches the kind Markonni conducted.

### III

■ The district court erred in applying *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), to grant "automatic standing" to defendant Allen to raise constitutional objection to the search of defendant Hunter by federal agents at the Detroit Metropolitan Airport. "Automatic standing" under *Jones* accorded standing to a person charged with possession under the penal law without any showing of actual possessory or proprietary interest in the seized property or the premises from which the property was seized.[2] Because of subsequent Supreme Court opinions in *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), however, "automatic standing" under *Jones* is no longer the recognized general rule in this Court. *United States v. Hearn*, 496 F.2d 236 (6th Cir. 1974).

■ The district court in the present case did not heed *Hearn* in analyzing the question of defendant Allen's standing and consequently arrived at an erroneous conclusion. An examination of the development of the law of standing to raise constitutional objection to searches and seizures by law enforcement officers shows that now the proper approach to the resolution of an issue of standing in a particular case is to determine whether personal Fourth Amendment rights were violated by the search and seizure. *Alderman v. United States, supra; United States v. Hearn, supra.* Under that test, defendant Allen does not have standing.

Prior to *Jones v. United States, supra*, there was no automatic standing concept. A person who sought to establish standing to raise constitutional objection to a search was required to allege facts, in support of a pre-trial motion to suppress evidence, showing that he either owned or possessed the seized property or had a substantial possessory interest in the premises searched. In possessory offenses this requirement meant that in order to establish the interest essential for standing a defendant had to come forward with the very proof which would convict him at trial. Judge Learned Hand in *Connolly v. Medalie*, 58 F.2d 629, 630 (2d Cir. 1932), stated the dilemma facing such a defendant.

> Men may wince at admitting that they were the owners, or in possession, of contraband property; may wish at once to secure the remedies of a possessor, and avoid the perils of the part; but equivocation will not serve. If they come as victims, they must take on that role, with enough detail to cast them without question. The petitioners at bar shrank from that predicament; but they were obliged to choose one horn of the dilemma.

*Jones v. United States, supra*, eliminated the dilemma with the automatic standing concept in the second ground of the decision. In *Jones*, the defendant had been living in a friend's apartment when federal

---

**2.** It is necessary under the automatic standing rule that possession at the time of search be an essential element of the charge. *United States v. Boston*, 510 F.2d 35 (9th Cir. 1974), *cert. denied*, 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975); *United States v. Groner*, 494 F.2d 499 (5th Cir. 1974); *United States v. Palazzo*, 488 F.2d 942 (5th Cir. 1974); *United States v. Sullivan*, 488 F.2d 138 (5th Cir. 1973).

agents came to the apartment and in their search found narcotics. Before trial the defendant sought to have the evidence suppressed, alleging that the search violated his constitutional rights. The Supreme Court held that standing should be granted to the defendant and placed that holding on two alternative grounds. First, anyone legitimately on premises where a search occurs has a sufficient interest to claim standing. Second, a person charged with a crime involving possession automatically has standing to challenge the legality of a search.

Subsequent case law in the Supreme Court, however, undercut any broad reading of the "automatic standing" rule of *Jones.* In *Alderman v. United States, supra,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, and in *Jones* itself, there was placed the clear limitation that only a person whose own Fourth Amendment rights have been invaded can have standing to object to the legality of a search. In *Jones,* the Court stated that a person who seeks to establish standing "must have been a victim of a search or seizure, one against whom the search was directed, as distinguished from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else." 362 U.S. at 261, 80 S.Ct. at 731. This conclusion the Court derived from "the general principle that a party will not be heard to claim a constitutional protection unless he 'belongs to the class for whose sake the constitutional protection is given.'" 362 U.S. at 261, 80 S.Ct. at 731. *Jones* clearly contemplated that a person could not claim standing as a result of the invasion of someone else's Fourth Amendment rights, and *Alderman v. United States, supra,* 394 U.S. at 171–72, 89 S.Ct. 961, confirmed that proposition.

The logic of the *Jones* automatic standing rule impliedly assumed that one charged with a possessory offense has had personal Fourth Amendment rights violated. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and *Brown v. United States,* 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973), made this implied assumption of *Jones* the only possible basis of support for the "automatic standing" rule. The narrow holding of *Brown* was that:

> . . . there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure.

411 U.S. at 229, 93 S.Ct. at 1569. Nevertheless, in arriving at the decision, *Brown* refused to afford automatic standing because "there was no risk to a defendant of either self-incrimination or prosecutorial self-contradiction." 411 U.S. at 229, 93 S.Ct. at 1569.

Of these two grounds suggested in *Brown* for the continuation of the "automatic standing" rule, only prosecutorial self-contradiction, the situation in which the Government alleges possession as part of the crime charged and denies that there is possession sufficient for standing purposes, is left. As *Brown* noted, *Simmons* removed the problem of defendant self-incrimination. *Simmons* held that "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection." 390 U.S. at 394, 88 S.Ct. at 976.

Moreover, *Brown* refused to admit that prosecutorial self-contradiction warranted the continuation of the "automatic standing" rule. *Brown v. United States,* 411 U.S. at 229, 93 S.Ct. 1565. Consequently, the implied assumption of the "automatic standing" rule that one charged with a possessory offense has had personal Fourth Amendment rights violated by the illegal search that discovered the contraband becomes crucial because that assumption links

the Fourth Amendment and possession in a way that makes prosecutorial self-contradiction the only possible support for the "automatic standing" rule.

In view of the doubt expressed by the Supreme Court on the continued viability of the "automatic standing" rule and of the decision in this Court in *United States v. Hearn, supra,* 496 F.2d 236, which denied that "automatic standing" was the general rule, we are forced to determine whether personal Fourth Amendment rights were violated in order to determine the issue of standing to raise constitutional objection to a search and seizure. The illegal search of defendant Hunter that discovered the heroin, resulting in the charge of constructive possession by defendant Allen, cannot be assumed to have resulted in the violation of defendant Allen's personal Fourth Amendment rights.

■ The Fourth Amendment in prohibiting unreasonable searches and seizures protects a person's "reasonable expectation of privacy" from arbitrary official action. *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the present case, defendant Allen did not have the heroin seized from him. The heroin was found sewn in defendant Hunter's girdle. Defendant Allen cannot assert defendant Hunter's Fourth Amendment rights but must assert his own. *Alderman v. United States, supra,* 394 U.S. 165, 89 S.Ct. 961. It would be an absurdity to suggest that defendant Allen had a reasonable expectation of privacy in defendant Hunter's girdle, but that conclusion would follow from a determination that defendant Allen had constructive possession sufficient for Fourth Amendment standing purposes.

This Court in *United States v. Hearn, supra,* 496 F.2d 236, rejected the idea that constructive possession could be a basis for standing. In *Hearn,* the charge was conspiracy to receive and conceal stolen goods. Standing was denied because the charge of conspiracy to receive and conceal goods does not have as an essential element of the crime possession at the time of seizure and because a co-conspirator's claim of constructive possession was not a valid basis for standing. *Hearn* said that constructive possession as a basis for standing was implicitly rejected in footnote 4 of *Brown v. United States, supra,* 411 U.S. at 229, 93 S.Ct. 1565. If, under *Hearn,* constructive possession cannot be a basis for standing, then when an illegal search and seizure of a person produces contraband and a second person is charged with constructive possession of the contraband, the illegal search and seizure did not invade the second person's Fourth Amendment reasonable expectation of privacy.

Certainly, there is no logical reason that the definition of possession accepted in interpreting criminal statutes delineate the sphere of a person's reasonable expectation of privacy. *See* Trager and Lobenfeld, *The Law of Standing Under the Fourth Amendment,* 41 Brooklyn L.Rev. 421 (1975). The Fourth Amendment and the criminal law have different purposes. The Fourth Amendment protects a reasonable expectation of privacy, *Camara v. Municipal Court of San Francisco,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and the criminal law is instituted to protect society from certain acts or kinds of behavior. *See Powell v. State of Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968).

■ It has been argued that the "primary justification" for the exclusionary rule as a deterrent to illegal police conduct, *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976), is not adequately served by a law of standing. *Alderman v. United States,* 394 U.S. 165, 201, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969) (Fortas, J., concurring in part and dissenting in part). The Supreme Court, however, has not proscribed the use of illegally seized evidence against all persons or in all proceedings. Rather, it has determined that there must in effect be a balancing of the

benefits to defendants other than the victim of the search or seizure by containing police activities within the letter of the law against the encroachment upon the public interest in having defendants acquitted or convicted on the basis of all the evidence which exposes the truth, in deciding whether the exclusionary rule has application, and, a fortiori, whether standing to invoke the rule exists. *Stone v. Powell, supra,* 428 U.S. at 486–89, 96 S.Ct. at 3048–49; *United States v. Calandra,* 414 U.S. 338, 351, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); *Alderman v. United States,* 394 U.S. 165, 174–75, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). A rule of standing approach provides some guidance in determining when the exclusionary rule would effectively deter illegal police conduct,[3] and it is the device that the Supreme Court uses to limit the application of the exclusionary rule to the end that the public interest in the determination of truth at trial is not unduly hampered. *Stone v. Powell, supra,* 428 U.S. at 486–89, 96 S.Ct. at 3048–49.

█ It is clear in the present case that defendant Allen's own Fourth Amendment rights were not violated. The district court order suppressing the evidence as to defendant Allen is reversed. Defendant Hunter had standing to contest the illegal search, and the district court order suppressing the heroin evidence as to her is affirmed.

---

**3.** There are cases in which the exclusionary rule does apply but in which the police were acting in good faith and were not affected in their conduct by the prospect of the rule applying. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 3071, 49 L.Ed.2d 1067 (1976) (White, J., dissenting).