**UNITED STATES of America, Plaintiff-Appellant,**

v.

**Tallice ANDREWS, Defendant-Appellee.**

**No. 78–5165.**

United States Court of Appeals, Sixth Circuit.

Argued Nov. 30, 1978.

Decided June 15, 1979.

As Amended July 18, 1979.

James K. Robinson, U. S. Atty., Victoria A. Toensing, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellant.

Richard R. Nelson, Detroit, Mich., for defendant-appellee.

Before KEITH and MERRITT, Circuit Judges and GREEN, Senior District Judge.*

---

\* The Honorable Ben C. Green, Senior District Judge for the Northern District of Ohio, sitting by designation.

1. See United States v. Mendenhall, 596 F.2d 706 (6th Cir. 1979) petition for cert. filed 47 USLW 3814 (1979); United States v. Smith, 574 F.2d 882 (6th Cir. 1978); United States v. Canales, 572 F.2d 1182 (6th Cir. 1978); United

Damon J. KEITH, Circuit Judge.

This is yet another case involving a stop, frisk and subsequent arrest by DEA agent Paul Markonni at the Detroit Metropolitan Airport. Unlike the "typical" Detroit Metro Airport case [1], this case does not involve a stop based on the much abused drug courier profile, but presents a rare instance of an anonymous tip providing the basis for the stop. Because we conclude that the district court erred in its determination that the initial stop of the defendant was unreasonable, we reverse and remand for further proceedings.

**I**

The full facts of this case, as found by the District Court are as follows:

On November 16, 1975, agents of the DEA received a phone call from an anonymous source who stated that Tallice Andrews would arrive at Detroit's Metropolitan Airport from Los Angeles at approximately 4:00 p. m. that day in the company of either a Negro male or a Negro female. The caller stated that Mr. Andrews would be carrying a quantity of heroin to be delivered to Sylvester Rhine, known to the agents as a local heroin trafficker. The caller described Mr. Andrews as a black male, dark complexioned, 25 or 26 years old, 5 feet, 10 inches tall with long processed hair, combed back.

The agents met the only flight arriving from Los Angeles at approximately 4:00 p. m. that day—American Airlines Flight 68. The agents watched passengers deplane from that flight. They observed a man deplane who fit Tallice Andrews' description. Near him, in a manner that suggested they were with him, but desired not to give that impression, were a Negro male and a Negro female. Mr.

States v. Pope, 561 F.2d 663 (6th Cir. 1977); United States v. Lewis, 556 F.2d 385 (6th Cir. 1977), cert. denied, 434 U.S. 1011, 98 S.Ct. 722, 54 L.Ed.2d 754 (1978); United States v. Craemer, 555 F.2d 594 (6th Cir. 1977); United States v. Gill, 555 F.2d 597 (6th Cir. 1977); United States v. McCaleb, 552 F.2d 717 (6th Cir. 1977).

**565**

Andrews' two companions appeared nervous. Mr. Andrews did not. The agents observed the three go to the baggage claim area where they picked up five bags. The two males each carried two bags and the female took the last one. As the three approached a cab outside the baggage claim area, Agents Paul Markonni and Doug Wankel stopped them and asked for identification. Fannie Braswell produced a driver's license in that name. Thurston Brooks stated he was Thurston Brooks but had no identification. Tallice Andrews first stated his name was James Johnson and that he was without identification. He later produced a birth certificate in the name of Tallice Arthur Andrews. When the agents asked to see the group's airline tickets Tallice Andrews produced tickets in the names of James Johnson, John Johnson, and Debra Thompson. Further inquiry elicited the assertion that the two males had come to Detroit together but that they had only met the female at the Los Angeles Airport. The agents then observed that all five bags had the name James Johnson on the outside.

At this point, the three were in effect placed under arrest for violation of narcotics laws and taken to a room inside the terminal. A search of their persons revealed no contraband. The suitcases in Mr. Andrews' possession were opened after he supplied the agents with a keyring containing two keys. No narcotics were discovered, but there was a box of live ammunition in one of the suitcases. Upon requesting the keys to the other suitcases Mr. Andrews gave the agents a keyring with only one key on it. Agent Markonni searched Mr. Andrews and discovered a key that opened the remaining suitcases. Two handguns were found inside these suitcases. No narcotics were found at this time. The Michigan authorities arrested Ms. Braswell and Mr. An-

drews for violations of the Michigan concealed weapons law. Mr. Brooks was released.

A short while later the agents received a phone call from the Wayne County Sheriff's Department requesting them to return to the room in which the search of the defendants had been conducted. When they arrived Officer McCants informed the agents that he had unlocked the door, entered and discovered a package of heroin secreted under some cushions on the couch. The spot he found the heroin was approximately where Ms. Braswell had been sitting throughout the search.

Fannie Braswell testified that she had carried the heroin under her pants. In most respects her testimony corroborated that of Agent Markonni and Officer McCants. She testified that she had come from Los Angeles with Defendant Brooks and Andrews and that while the search of the suitcases was going on, she removed the heroin from her pants and placed it under the cushion of the couch.

## II

The above-cited facts present a host of Fourth Amendment issues. Only one issue on which the district judge ruled is before us on this appeal by the government—the legality of the initial stop of Tallice Andrews.[2]

The district court analyzed the facts and concluded that the DEA agents had insufficient grounds for the stop. Applying the "two pronged" probable cause test advanced in *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); the district court reasoned that the tip was insufficient under both prongs of the test and was thus inadequate even to provide reasonable suspicion for a stop.

---

**2.** The court also ruled that co-defendant Thurston Brooks lacked standing to challenge any of the items seized and that defendant Andrews lacked standing to challenge the admissibility of the heroin found in the room where the search was conducted. *See United States v.* *Hunter,* 550 F.2d 1066 (6th Cir. 1977). These issues are not before us, inasmuch as this case concerns a government appeal under 18 U.S.C. § 3731. Defendants cannot cross-appeal under this statute. *United States v. Olt,* 492 F.2d 910, 912 (6th Cir. 1974).

Inasmuch as the tipster was anonymous, and refused to provide any information about himself, even when asked to do so, we must agree that the first *Aguilar-Spinelli* prong was not met since there is no way that we can characterize the informant as reliable. We may also assume that the tip itself was insufficient to meet the second *Aguilar-Spinelli* prong since there was nothing contained in the tip from which an independent magistrate could have determined how the informant obtained his information.

Nonetheless, we feel that these circumstances were such that a stop—although not necessarily an arrest—was justified. The facts on which the initial stop of Andrews and his companions was based were (1) the information contained in the anonymous tip.[3] (2) The agent's personal knowledge and observations. (The agents corroborated the tip in that a man meeting Andrews description did arrive on a flight approximately when indicated, accompanied by a black man and woman. Also, the agents knew of Sylvester Rhine's reputation as a drug trafficker) (3) nervousness of two of the three individuals, (4) the fact that the defendants were travelling from Los Angeles, an alleged narcotics distribution center.

■ We agree with the district court that nervousness by two of Andrews' companions should be entitled to no weight. Nervousness is entirely consistent with innocent behavior, especially at an airport where a traveller may be anticipating a long-awaited rendezvous with friends or family.[4] *See United States v. McCaleb,* 552 F.2d 717, 720 (6th Cir. 1977); *United States v. McClain,* 452 F.Supp. 195, 200 n.3 (E.D. Mich.1977).

Similarly, travel from Los Angeles cannot be regarded as in any way suspicious. Los Angeles may indeed be a major narcotics distribution center, but the probability that any given airplane passenger from that city is a drug courier is infinitesimally small. Such a flimsy factor should not be allowed to justify—or help justify—the stopping of travellers from the nation's third largest city. *See United States v. McCaleb, supra* at 720; *United States v. Scott,* 545 F.2d 38, 40 n.2 (8th Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977). Moreover, our experience with DEA agent testimony in other cases makes us wonder

3. Agent Markonni's testimony concerning the tip was as follows:

At approximately 2:15, I answered the phone ring in our office, the Drug Enforcement office, at Metropolitan Airport, and an individual who I believed to be a Negro male from the sound of his voice, started to tell me about someone coming into the airport with narcotics. At that time, I asked Agent Wankel to pick up the other telephone and listen to the conversation. Then I went back to talk to the individual, and he informed me that a man that he knew as Tallice Andrews was supposed to arrive at Detroit Metropolitan Airport at approximately 4:00 o'clock on that date, from Los Angeles, and that he would be traveling with either another Negro male or female, and that he would be carrying a large quantity of heroin which he was going to deliver to a person named Sylvester Rhine—R-h-i-n-e. And I elicited a description of Tallice Andrews from the person.

I tried to get him to identify himself. He would not identify himself. I asked him how he got our number, and he indicated that he had been given our number by the Detroit Police Department; which happens, occasionally they will refer calls to us.

Q Can you tell us what that description was of Mr. Andrews?

A Andrews was supposed to be a black male, approximately twenty-five—twenty-six years old, about five feet ten inches tall, dark complexion, with long, processed hair that was combed back a little bit, rather than like an Afro, straightened hair.

Q Did the caller say the city from which the flight would originate?

A He said he would arrive from Los Angeles.

4. In other contexts, the government has argued the nervousness factor in various ways. For example, in *United States v. Escamilla,* 560 F.2d 1229, 1233 (5th Cir. 1977) the court noted that at times the government argues that it was suspicious for the occupants of a vehicle in the border zone to react nervously when a patrol car passed, while at other times the government argues that it was suspicious if the occupants just looked at the road and did not acknowledge the patrol car. Similarly, in *United States v. Himmelwright,* 551 F.2d 991, 992 (5th Cir. 1977), the government argued that it was suspicious that a woman was excessively calm while going through customs.

whether there exists any city in the country which a DEA agent will not characterize as either a major narcotics distribution center or a city through which drug couriers pass on their way to a major narcotics distribution center.

■ As the district court recognized, the issue presented by this case is whether the informant's tip, coupled with the agents' knowledge and observations was enough to justify a stop. The tip itself was somewhat specific in that Andrews was named and accurately described, as was the flight on which he was arriving and that the drugs which he was allegedly carrying were to be delivered to a named individual. Still, there was no basis given for the information, and it cannot be said to have been so detailed that a magistrate "could reasonably infer that the informant had gained his information in a reliable way." *Spinelli v. United States,* 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969).

■ The reasonably detailed tip, however, was corroborated in two respects. First, Agent Markonni testified that Sylvester Rhine, the named person to whom the drugs were supposed to be delivered, was a known Detroit narcotics dealer whom Markonni had investigated in the past. Second, a person meeting the tipster's description of Andrews arrived on a flight from Los Angeles approximately when the informant stated that he would.

We do not need to determine the continued vitality of language in *Spinelli, supra* 393 U.S. at 414, 89 S.Ct. 584 that a suspect's reputation is irrelevant to a probable cause determination, in light of the disapproval of this language expressed by Chief Justice Burger and two of his colleagues in *United States v. Harris,* 403 U.S. 573, 580–83, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971) (plurality opinion). Agent Markonni's personal knowledge of Rhine is far different from a case where a suspect possesses a general criminal reputation.[5] When this knowledge was combined with Andrews' arrival in conformity with the tipster's reasonably detailed tip, we think that the agents had sufficient basis to stop and question Andrews.

We note that we are not dealing with the issue of probable cause for an arrest, but with reasonable suspicion for a stop. In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) the Supreme Court first advanced the reasonable suspicion test which allowed law enforcement officers to stop persons on the street when the officer's observations reasonably raised suspicion of criminal conduct.[6] Efforts to confine *Terry*-stops to dangerous crimes or to limit their applicability to situations where the police officer had personally observed the suspicious conduct in question were rejected by the Supreme Court in *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Like this case, *Adams* involved a stop based on information provided to law enforcement officers by a tipster.[7] Unlike

---

**5.** The situation here is analogous to that in *United States v. Oates,* 560 F.2d 45 (2d Cir. 1977) where the court stated:

"While investigative stops certainly cannot be made 'merely because [the detainees] have criminal records or bad reputation,' . . . a police officer's knowledge of a person's reputation as a prominent narcotics trafficker can properly be considered, along with other factors, as an element justifying the officer's reasonable suspicion or his belief that probable cause exists"

*Id.* at 59.60. (Citations omitted but commended to the reader)

**6.** As this court noted in *United States v. Smith,* 574 F.2d 882, 885 (6th Cir. 1978), *Terry v. Ohio,* actually dealt only with the issue of reasonable suspicion justifying a limited frisk of a person

believed to be armed and dangerous. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), makes it clear that reasonable suspicion is the test to be applied to a stop as well. *See also United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (reasonable suspicion is the standard to be used to stop vehicles traveling in the border zone).

**7.** Also like *Adams,* this case presents problems of possible police perjury in that there is no way to verify the DEA's story regarding the anonymous tipster. Judge Friendly's opinion for the en banc Second Circuit in *Williams v. Adams,* 436 F.2d 30, 38–39 (2d Cir. 1971) noted that in situations such as this one, a police officer could always, after the fact, invent an informant whose tip justified the conduct

this case, the informant in *Adams* was personally known to the officer, had provided information in the past and was present at the scene. There, the informant told the officer, simply, that a person seated in a nearby vehicle was carrying narcotics and had a gun at his waist. Rejecting any particular rule to be applied, the court concluded that the informant's tip "carried enough indicia of reliability to justify the officer's forcible stop of Williams." *Id.* at 147, 92 S.Ct. at 1924.

In *Adams,* the "indicia of reliability" was provided by the source of the information—the tipster who was known and at the scene. On the other hand, the *Adams'* tipster's conclusory statements—that a man seated in a car possessed a gun—carried no "indicia of reliability." Here, we have the opposite case—the informant is completely unknown, but his information was detailed and corroborated. We think that the detail and corroboration in this case provided sufficient "indicia of reliability" to warrant a limited stop for questioning of Andrews.[8]

Appellees emphasize that the tip failed *both* prongs of the *Aguilar-Spinelli* test[9] and that the only corroboration which took place was of innocuous conduct—the arrival of Andrews at the airport. Appellees urge that "the corroborating information must confirm that the arrestee committed the felony or was in the process of committing the felony." *United States v. Jackson,* 533

F.2d 314, 318 (6th Cir. 1976), *citing Whiteley v. Warden,* 401 U.S. 560, 567, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

Justice Harlan's language in *Whiteley* concerning the type of conduct which need be corroborated to raise a deficient tip to probable cause levels has caused difficulty. *Compare* the majority and dissenting opinions in *United States v. Edmond,* 548 F.2d 1256 (6th Cir. 1977).[10] Further, Justice Harlan in *Whiteley, supra* 401 U.S. at 567, 91 S.Ct. 1031 favorably cited the corroboration of the informant's tip which occurred in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Yet an examination of the facts in *Draper* reveals that the only conduct corroborated by the police could also be deemed innocent—a man arrived at a train station at one of two times specified by an informant and wore clothing closely corresponding to the informant's detailed description. *See Spinelli v. United States,* 393 U.S. 410, 423–29, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) (White, J. concurring).

The solution to this seeming paradox can perhaps be found in Justice Harlan's explanation of *Draper* in *Spinelli v. United States,* 393 U.S. 410, 417–18, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969): "It was then apparent that the informant [in *Draper* ] had not been fabricating his report out of whole cloth; since the report was of the sort which in common experience may be

---

which took place. Where an officer testifies to his own observations, there exists at least one other person—the defendant—who can dispute the officer's story. Where the officer bases his conduct on an informant's alleged tip, there is generally no one who can challenge the officer's story. In *Adams,* however, the Supreme Court did not accept Judge Friendly's views, apparently not considering the spectre of police perjury serious enough to warrant invalidating stops based on unverified third-party information. We see no evidence of fabrication in this case.

**8.** The fact that the DEA agents merely stopped Andrews and asked for identification is significant. When one balances the need for the stop with the gravity of the stop's intrusion on appellee's rights, we think that the DEA agents acted reasonably. For one view of the Fourth Amendment balancing test to be applied in

situations similar to this one, see *United States v. Oates,* 560 F.2d 45, 59–60 (2d Cir. 1977).

Given the widely varying situations present in "street stop" cases, the law in this area can hardly be described as uniform. It sometimes appears that courts simply conclude that the police acted reasonably. The problem with adopting a general "reasonableness" analysis on an *ad hoc* case by case basis is that law enforcement officers are left with no guidance. *See* Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn.L.Rev. 349, 390–95 (1974).

**9.** We note that the tip in *Adams v. Williams, supra,* also failed both prongs of the *Aguilar-Spinelli* test.

**10.** Candor compels acknowledging that the author of this opinion was the district judge who was reversed in *Edmond.*

recognized as having been obtained in a reliable way, it was perfectly clear that probable cause had been established." [11]

We need not define here the exact nature of the information which must be corroborated to warrant a probable cause determination. Although this informant's tip did not possess the detail furnished by the informant in *Draper,* the anonymous tipster's description of Andrews was accurate, as was Andrews' predicted arrival on the flight from Los Angeles.[12] The additional added factor of Sylvester Rhine's reputation further indicated that this report was not fabricated "out of whole cloth." Considering that we are dealing with a lowered standard of reasonable suspicion,[13] and not with probable cause, we conclude that Agent Markonni had sufficient reasonable suspicion to stop and question Andrews.

The one Circuit which has squarely addressed a similar situation involving an anonymous tip has sustained a stop on facts far flimsier than the ones here. In *Ojeda-Vinales v. Immigration & Naturalization Serv.,* 523 F.2d 286 (2d Cir. 1975), an anonymous tipster informed the Immigration and Naturalization Service that an undocumented alien named Jose was working as a mechanic at a given address. Agents went to the shop in question and verified that a Jose worked there as a mechanic. Held: sufficient reasonable suspicion to justify a stop.[14]

Other courts which have considered the issue of information from unknown or unreliable third parties as the basis for reasonable suspicion have upheld stops in various contexts: *United States v. Sierra-Hernandez,* 581 F.2d 760 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978) (unidentified man told officer that a truck which was pulling away had just loaded up with marijuana at a site where previous illegal activity was known to have taken place.) *United States v. Gorin,* 564 F.2d 159 (4th Cir. 1977), *cert. denied,* 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978) (anonymous phone call that a man at a certain bar had a gun. Man described with reasonable specificity and tip confirmed by bar owner); *United States v. Nunn,* 525 F.2d 958, 959 n.2 (5th Cir. 1976) (anonymous tip that six aliens were lying in the open bed of a two-tone, late model Ford pickup truck being driven on a certain highway by two black men. Dicta that there was "most likely" reasonable suspicion for a stop); *United States v. Cage,* 494 F.2d 740 (10th Cir. 1974) (officers could stop described car whose occupants fitted the sex and ethnic description of radio bulletins which asserted that they had been involved in an assault); *United States v. Hernandez,* 486 F.2d 614, 616–17 (7th Cir. 1973), *cert. denied,* 415 U.S. 959, 94 S.Ct. 1488, 39 L.Ed.2d 574 (1974) (anonymous tip "described defendant's vehicle by year, model and license plates and stated that it carried Mexicans, covered by blankets, who had entered the country illegally." Described vehicle was located on the road indicated.); *United States v. Legato,* 480 F.2d 408, 410 (5th Cir.) *cert. denied,* 414 U.S. 979, 94 S.Ct. 295, 38 L.Ed.2d 223 (1973) (anonymous phone tip that someone carrying a bomb in an orange shopping bag would try to board a flight to Chicago at a certain time. Individual with such a shopping bag tried to leave airport when loudspeaker announced that security search would be made); *United States v. Preston,* 468 F.2d 1007 (6th Cir. 1972) (an at the time unknown bystander at the scene of a shooting told police that weapons were located in a nearby vehicle). The above-cit-

---

**11.** We are aware that the informant in *Draper* was, unlike here, reliable. However, we are here dealing with the lower standard of reasonable suspicion and not with probable cause.

**12.** To this extent, the facts here are roughly analogous to those in *Draper.*

**13.** The Supreme Court's approach in *Adams v. Williams, supra,* has been termed "rather lenient" by the Second Circuit. *United States v. Magda,* 547 F.2d 756, 759 (2nd Cir. 1976).

**14.** Our citation of *Ojeda-Vinales,* should in no way be construed as an endorsement of that decision. If Hispanic-Americans can be stopped on anonymous tips that someone named Carlos or Jose is located at a given address, then the Fourth Amendment will have little meaning indeed. We do note that in *Ojeda-Vinales,* the officers corroborated the tip before making the stop.

**570**

ed cases fairly stand for the proposition that information from an unknown informant will support a stop if sufficiently detailed and/or corroborated.[15]

The facts of this case stand in sharp contrast to those in *United States v. DeVita,* 526 F.2d 81 (9th Cir. 1975), where an unreliable informant gave the vague tip "that a Mr. DeVita would be transporting some type of narcotics, possibly to the Pittsburgh area, sometime in the near future." *Id.* at 83. Further, a five-month surveillance of Mr. DeVita had proved fruitless.

A closer case invalidating a stop, but also distinguishable on its facts, is *United States v. McLeroy,* 584 F.2d 746 (5th Cir. 1978). There, an unknown informant's reasonably detailed tip was corroborated to the extent that the police confirmed the suspect's name and address and the description of his automobile. The court concluded that the information was readily available to many persons and that knowledge of that information would not mean that the informant knew more personal details about the suspect. We think that the corroborated information in this case was more probative than that in *McLeroy.*

### III

The government concedes that an arrest took place shortly after the stops. It argues that additional corroborative factors developed at the stop were sufficient to provide probable cause for the subsequent arrests and searches which took place.[16] This difficult issue was not addressed by the district court. We think that the prudent course of action here is to remand for a direct determination by the district court, especially since crucial witness credibility issues are at stake which we are ill-equipped to pass upon.[17]

The district court's judgment that Tallice Andrews was illegally stopped is reversed. This case is remanded to the district court for further proceedings.

---

**15.** Of course, pursuant to *Adams v. Williams, supra,* courts have had no trouble upholding stops where the informant was found to be reliable. *See, e. g. United States v. Scott,* 545 F.2d 38 (8th Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 796, 50 L.Ed.2d 784 (1977); *United States v. Poms,* 484 F.2d 919 (4th Cir. 1973). *See* also discussion in *United States v. Sierra-Hernandez,* 581 F.2d 760, 763 (9th Cir.), *cert. denied,* 439 U.S. 936, 99 S.Ct. 333, 58 L.Ed.2d 333 (1978).

**16.** The additional factors were 1) concealing association, 2) nervousness, 3) use of an alias, 4) false statements.

**17.** The government places heavy reliance on *United States v. Canieso,* 470 F.2d 1224 (2d Cir. 1972) and *United States v. Archuleta,* 446 F.2d 518 (9th Cir. 1971), where courts found probable cause under circumstance analogous to those here. A crucial distinguishing factor, however, was that the informants in those cases were not anonymous and completely unknown, as was the informant here. *Contrast* the detailed circumstances which led this court to find probable cause in *United States v. Prince,* 548 F.2d 164 (6th Cir. 1977).

We leave it to the able district court to weigh all of the factors and make an overall judgment on the probable cause question.