**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William Thomas DALPIAZ, Defendant-Appellant.**

**No. 73-2048.**

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 5, 1974.

Decided April 5, 1974.

J. Gregory Wehrman, Wehrman & Wehrman, Covington, Ky., for defendant-appellant.

Eugene E. Siler, U. S. Atty., for plaintiff-appellee; John M. Compton, Asst. U. S. Atty., Lexington, Ky., on brief.

Before PHILLIPS, Chief Judge, LIVELY, Circuit Judge, and McALLISTER, Senior Circuit Judge.

LIVELY, Circuit Judge.

A jury found the defendant guilty of attempting to board an aircraft with concealed deadly and dangerous weapons on his person in violation of 49 U.S.C. § 1472(l). On January 24, 1973 the defendant made a cash purchase of a one-way ticket on North Central Airlines flight 427 from Cincinnati, Ohio to Milwaukee, Wisconsin. He had no checked baggage, but did have several pieces of carry-on luggage. At this time all boarding passengers at the greater Cincinnati airport were required to go through a security check. When the defendant reached the checkpoint for his flight he handed the Pinkerton agent who was stationed there a small green case and advised her that it contained a gun. She did not open the case, but set it aside and told defendant that he could not take it aboard but that it would travel on the same plane and be returned to him at Milwaukee. The security guard then searched the remainder of defendant's carry-on luggage and found a walkie-talkie, a gun holster, a hunting knife with a four-inch blade and a woman's cigarette case which had a number of wires inside it. The knife was set aside with the revolver for handling by the airline. The defendant was then asked to walk through the metal detection device known as a magnetometer and it was activated by his passage. The guard asked him to remove all metal objects and after removing some things from his pockets he passed through the magnetometer and again activated it. He then produced an alarm clock from his clothing and upon walking through the magnetometer a third time it was again activated. This time he produced six bullets which were taped together. The Pinkerton guard took the bullets and defendant then was able to walk through the magnetometer without activating it.

Since the departure time of the plane was imminent, the agent accompanied Dalpiaz to the boarding gate and asked him to have a seat. She then advised the boarding officer of the items that she had found in defendant's possession and excused herself ostensibly to obtain baggage tags for the items which she had taken from Dalpiaz and were to be transported separately by the airline. She returned to the security checkpoint and immediately contacted the airport police by telephone. Officer John Obel came from the front entrance of the terminal to her station. She advised him of the items which she had taken from the defendant and of her apprehension that he might pose a danger to the aircraft. Officer Obel started toward the boarding gate and encountered Dalpiaz and the boarding agent walking back toward the security point. When they reached the security checkpoint, Officer Obel asked him to empty his pockets. Among other things, the defendant produced an explosive device known as a projectile simulator from inside a heavy winter coat which he was wearing. This device had no metal parts, but contained printed instructions which indicated that it was quite dangerous to humans if it exploded in close proximity to them. The defendant then opened the bag containing the gun for Officer Obel and revealed an unloaded 38-calibre secret service special. No further search was conducted at this point, but the defendant was asked to go to the security office and did accompany Officer Obel there. A short time later an officer read a statement of rights to the defend-

# 376

ant and he was subjected to a thorough search. Eventually agents of the FBI came to the security office and took defendant into custody along with the gun, bullets, knife and projectile simulator.

■ The defendant moved to suppress the projectile simulator as evidence on the grounds that the search was made without warrant and without authority, was not incidental to an arrest and was unreasonable. After a hearing out of the presence of the jury, the court overruled the motion, and the trial proceeded. Under Kentucky law, defendant was guilty of a felony violation in carrying the hunting knife concealed in his hand luggage. KRS 435.-230(1) has been interpreted by the Court of Appeals of Kentucky to make it a felony to carry concealed a knife with a blade smaller than that carried by defendant. Asher v. Commonwealth, 473 S.W.2d 145 (Ky.1971). As a peace officer, Obel was authorized under KRS 431.005 to make an arrest without a warrant "when he has reasonable grounds to believe that the person being arrested has committed a felony." However, Officer Obel testified positively that he did not place the defendant under arrest prior to the time the projectile simulator was produced. While formal words are not necessary to constitute an arrest, United States v. Baxter, 361 F.2d 116, 118–119 (6th Cir.), cert. denied, 385 U.S. 834, 87 S.Ct. 79, 17 L. Ed.2d 69 (1966), nevertheless, in view of the detaining officer's positive testimony that he did not believe an arrest had been made we do not treat the search of Dalpiaz as one incident to a lawful arrest.

■■ We note that the indiscriminate search of all boarding passengers by magnetometer and inspection of hand baggage has been upheld as an administrative search which may be conducted without a warrant in reliance on Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). However, it must appear that the person who is subjected to such a search has an opportunity to avoid it by electing not to board an aircraft. United States v. Davis, 482 F.2d 893, 910–911 (9th Cir. 1973). The basis for upholding such searches is that a person who proceeds to attempt to board a plane in the face of widespread publicity about the problem of air piracy and specific airport notices concerning the security measures which are employed to detect potential hijackers consents to this limited search. *Ibid.* at 913. But see United States v. Kroll, 481 F.2d 884, 886 (3rd Cir. 1973). However, the present case is concerned only with the search which produced the projectile simulator because the defendant, in his brief, states that he:

> . . . does not contest the reasonableness or validity of the intrusion upon Dalpiaz's privacy by use of the magnetometer in view of the overwhelming governmental interest in preventing aerial hijacking and protecting both passengers and the general public from potential harm. However, once the magnetometer gives a clear reading and all hand baggage has been cleared, and the passenger is forwarded to the boarding gate, the exception to the Fourth Amendment searches by means of the magnetometer has been met.

Because of the defendant's concession, we are not called upon to decide whether the search of all boarding passengers by magnetometer and inspection of luggage is permissible.

We are concerned here with the detention and search by airport security personnel of one whose actions have aroused their suspicion. The defendant Dalpiaz was not detained because he fit a "hijacker profile," the situation which occurred in United States v. Skipwith, 482 F.2d 1272 (5th Cir. 1973), but which was not the basis of the court's decision. It differs also from United States v. Slocum, 464 F.2d 1180 (3rd Cir. 1972), where the defendant was first noticed as a "profile case," but the actual search of his hand luggage was precipitated by the fact that he activated the magnetometer but had no metallic

objects on his person. We believe the facts of this case bring it within the rule of Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968). A number of airport searches which occurred after a person had become the object of particular interest to security officers because of suspicious behavior or activation of a magnetometer have been upheld in reliance on *Terry*. E.g., United States v. Moreno, 475 F.2d 44 (5th Cir.), cert. denied, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973); United States v. Riggs, 474 F.2d 699 (2d Cir.), cert. denied, 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973); United States v. Slocum, *supra*; United States v. Bell, 464 F.2d 667 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34 L.Ed.2d 258 (1973); United States v. Epperson, 454 F.2d 769 (4th Cir.), cert. denied, 406 U. S. 947, 92 S.Ct. 2050, 32 L.Ed.2d 334 (1972).

Chief Justice Warren, writing for the Court in Terry v. Ohio, *supra*, quoted from Elkins v. United States, 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960), the familiar statement—

[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures. 392 U.S. at 9, 88 S.Ct. at 1873.

The narrow constitutional question before the Court in *Terry* was stated to be:

Whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest. 392 U.S. at 15, 88 S.Ct. at 1877.

The Court recognized that any restraint of a person by a police officer is in fact a seizure of the person within the meaning of the Fourth Amendment. Holding that the Warrant Clause of the Fourth Amendment does not apply to police conduct involving the "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat," the Court defined the test of such conduct in terms of "the Fourth Amendment's general proscription against unreasonable searches and seizures." 392 U.S. at 20, 88 S.Ct. at 1879.

After discussion of the type of governmental interests which may justify intrusion upon protected interests of private citizens, the Court concluded that a balancing of needs is required. The opinion prescribes an objective test of the appropriateness of the action taken in light of the facts available to the officer at the moment rather than a subjective standard of good faith. Especially applicable to this case and others involving airport searches where one or more individuals have been singled out for more extensive investigation than that to which all passengers are subjected is this statement of the Court in *Terry*:

And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. 392 U.S. at 21, 88 S.Ct. at 1880.

We find that the testimony of Officer Obel meets this standard.

The defendant, on the other hand, maintains that when he had successfully passed through the magnetometer "the officer's directive to Dalpiaz to empty his pockets was neither justified nor reasonable, and clearly went beyond the limited scope of *Terry, supra*." Although the *Terry* case was concerned with a "pat-down" of the outer clothing of a suspect, we do not read it as limiting the principles enunciated in the opinion to "pat-down" situations. Prior to the search complained of, Officer Obel had been apprised by another security guard of the fact that defendant, the holder of a one-way ticket with no checked luggage, had in his possession at the entrance to the boarding area a pistol and a knife with a large blade, and that he had activated the metal detector three times. At this time the defendant was inside the boarding area which served three airlines. There were

other passengers in the area, a number of them being around the defendant. Although Officer Obel testified that he was not in fear for his own safety, one of his duties was to protect other passengers and members of the public who used the airport facilities. The opinion in *Terry* states the rule which justifies police intrusion into the personal security of an individual under circumstances such as those presented in this case in the following language:

> When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. 392 U.S. at 24, 88 S.Ct. at 1881.

The opinion makes it clear that it is not necessary that the officer be certain that the suspect is armed—only that a reasonably prudent person would be warranted in believing he or others were in danger.

The security problems created by the hijacking of passenger airlines were clearly set forth by the Court of Appeals for the Fifth Circuit per Judge Gewin, in the following language:

> Apart from the unusual dangers inherent in the crime itself, aerial hijacking has created equally unusual detection problems. Unlike most other crimes, hijacking is one in which secrecy is not a principal concern. Once the hijacker decides to act, he doesn't care if there are numerous witnesses. Indeed, according to the pattern developed thus far, he prefers as many as possible because each one is a potential hostage to shield him from apprehension until he can be flown to a political sanctuary or place of concealment. Obviously, in order to jeopardize the lives and safety of the smallest number of people, the hijack-

er must be discovered when he is least dangerous to others and when he least expects confrontation with the police. In practical terms, this means while he is still on the ground and before he has taken any overt action.

> Clearly, this would not be an easy objective to accomplish under the best of conditions. But amidst the rush and the congestion of many airports, this task is vastly complicated. Airport security officials have the awesome responsibility of ferreting out hijacking threats from among thousands of passengers while at the same time avoiding any undue disruption to this nation's heavy flow of commercial air traffic. Inseparably related to this is the fact that the hijacker's modus operandi is designed to take optimum advantage of these pressures. The hijacker prefers the anonymity of the crowd where he is but a part of the blend. The hiding place of his weapons is the commonplace accessory of air travelers everywhere—the overnight bag, the briefcase, the overcoat or other clothing. His arsenal is not confined to the cumbersome gun or knife; for modern technology has made it possible to miniaturize to such a degree that enough plastic explosives to blow up an airplane can be concealed in a toothpaste tube. A detonater planted in a fountain pen is all that is required to set it off. Unfortunately, society's law enforcement capabilities have not caught up with these problems. It is in this context that we must assess the constitutionality of the search of Moreno. (footnote omitted) United States v. Moreno, *supra*, 475 F.2d at 49.

The defendant seeks reversal on the basis of United States v. Ruiz-Estrella, 481 F.2d 723 (2d Cir. 1973). In that case the court held that the evidence did not reveal "specific and articulable facts" and that *Terry* did not apply. Significantly, in the *Ruiz-Estrella* opinion the court, in commenting on the different result reached in United States v. Epperson, *supra*, stated that—

We do note, however, that we regard the facts of that case, where the suspect activated the device a second time after removing several metal objects from his person, as presenting a far more compelling situation than the one at hand. 481 F.2d at 729.

The court then went on to conclude that a case-by-case inquiry is necessary when dealing with searches based on reasonable suspicion. We agree, and hold that the circumstances presented by this record justified the intrusion.

The judgment of the district court is affirmed.