**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Jeffrey Scott FREELAND, Defendant-Appellant.**

**No. 76–2476.**

United States Court of Appeals, Sixth Circuit.

Argued April 8, 1977.

Decided Sept. 12, 1977.

Certiorari Denied Nov. 14, 1977. See 98 S.Ct. 484.

Raymond A. White, Dayton, Ohio, Thomas C. Smith, Taliaferro & Smith, Covington, Ky., for defendant-appellant.

Eldon L. Webb, U. S. Atty., Richard E. Duerr, Jr., Lexington, Ky., for plaintiff-appellee.

Before PHILLIPS, Chief Judge, and WEICK and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

Defendant Freeland was found guilty in a non-jury trial of knowingly delivering a firearm to a common carrier for shipment in interstate commerce without written notice, in violation of 18 U.S.C. § 922(e) (1970).

The sole issue in Freeland's appeal is the validity of the search of his luggage at the Greater Cincinnati Airport which produced the gun. Following a hearing on Freeland's motion to suppress, the district court ruled that he had consented to the search and that in any event, it was valid under *United States v. Dalpiaz*, 494 F.2d 374 (6th Cir. 1974). We affirm.

Shortly before flight time on the evening of Friday, April 16, 1976, Jeffrey Scott Freeland presented himself at the Delta Airlines ticket counter in the Greater Cincinnati Airport for the purpose of purchasing a one-way passage to Miami, Florida, which he had earlier reserved under the fictitious name of Floyd Perry. Ticket Agent Harold Patterson was suspicious of Freeland because he appeared to meet certain elements of a hijacker profile then in use by Delta Airlines. When Freeland sought to pay cash for the ticket and failed to produce any personal identification, Patterson summoned his supervisor, Rayburn Miller. On Miller's instructions Patterson issued the ticket. Meanwhile, Freeland had placed his suitcase on the weight scale next to the counter to be checked through to Miami. There was no indication that it was to accompany him personally on the plane. Nevertheless, Miller, after placing the baggage ticket on the suitcase, told Freeland that the suitcase would have to be x-rayed. Miller accordingly picked up the bag and asked Freeland to follow him. Together they went upstairs to the passenger screening area where Miller placed the suitcase on the conveyor to be x-rayed. One of the operators of the x-ray units, Kay Reeves, observing an unidentifiable object on the inside of the suitcase, asked a fellow employee, Kathy Noakes, to "hand check it". Reeves and Noakes were both involved in the pre-screening of passengers and had been furnished to Delta Airlines for that purpose by the Wackenhut security agency. While the defendant disputed it, the trial court accepted the testimony of Ms. Noakes that she told Freeland that the bag would have to be opened, and that he replied with a shrug. Upon opening the suitcase, the gun was discovered. Ms. Noakes promptly summoned Sergeant Wendell Kegley of the

Cincinnati Airport police. Upon his arrival Kegley observed the firearm which had already been discovered in the suitcase and arrested Freeland.

On the foregoing facts the government urged before the district court that Ms. Noakes' opening of Freeland's bag was a search by a nongovernmental airline employee and was not subject to the Fourth Amendment. The district court, on the other hand, ruled that "the search was part of a national policy and was done within the regulations prescribed by the Federal Aviation Administration",[1] and was therefore subject to Fourth Amendment scrutiny, relying on the authority of *United States v. Davis*, 482 F.2d 893 (9th Cir. 1973). *See also United States v. Fannon*, 556 F.2d 961 (9th Cir. 1977).

Federal Aviation Administration regulations require the presence of at least one law enforcement officer at the point of and throughout the final passenger screening process prior to boarding[2] and define that officer as one who is not only authorized to carry and use firearms, but who is vested with a police power of arrest under federal, state, or other governmental authority. 14 C.F.R. § 107.1(e).

■ Contrary to the suggestion in the district court's opinion, we do not believe that all searches of passengers' luggage at airports are invariably subject to the proscription of the Fourth Amendment. Rather, the question of governmental involvement in the search is determined by the particular facts at hand. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). *See United States v. Burton*, 475 F.2d 469, 471 (8th Cir. 1973); *United States v. Mitchell*, 352 F.Supp. 38, 42–43 (E.D.N.Y.1972), *aff'd without opinion* 486 F.2d 1397 (2d Cir. 1973). Here the search was in fact carried on by private security personnel engaged by the airlines. We find nothing in the record to indicate that they were deputized or otherwise agents acting under governmental direction or authority. Apparently Reeves and Noakes did not conceive that they had any authority to effectuate an arrest since they called upon the airport police sergeant for this purpose.

■ Where a motion to suppress evidence has been made, the burden of establishing that the evidence was secured by an unlawful search is on the moving party. *E. g., United States v. Wright*, 468 F.2d 1184, 1185–86 (6th Cir. 1972), *cert. denied* 412 U.S. 938, 93 S.Ct. 2771, 37 L.Ed.2d 397 (1973). It was thus incumbent upon Freeland to demonstrate that sufficient governmental involvement existed to invoke the proscriptions of the Fourth Amendment.

■ Assuming, however, because the district court did, that the Wackenhut personnel effecting the search were law enforcement officers within the meaning of FAA regulations and measuring the search and seizure by Fourth Amendment standards, we have no difficulty in agreeing with the district court that Freeland consented to the search of his luggage. As the district court found:

Although Miller did not tell Freeland he could withdraw the bag or refuse to board, nevertheless, a sign was posted at the ticket counter advising Freeland of this and that checked baggage could be examined. Had Freeland asked for the bag back, Miller would have allowed him

1. *See* 14 C.F.R. § 121.538.

2. 14 C.F.R. § 107.4 provides:
   [E]ach airport operator shall, not later than January 6, 1973, submit for approval by the Administrator an amendment to the master security plan included in its security program that sets forth facilities and procedures which insure that as soon as possible, but in no event later than February 6, 1973—
   (a) At least one law enforcement officer is present at the point of, and prior to and throughout, the final passenger screening process prior to boarding, for each flight conducted by a certificate holder required to have a security program under § 121.538 of this chapter, and by each foreign air carrier that requests such law enforcement support;
   (b) The law enforcement officer is present continuously until all doors on the aircraft being boarded are closed and the aircraft has taxied away from the boarding area . . . .

the bag and would have allowed him not to board the plane.

Our review of the testimony convinces us that the trial judge's holding is fully supported by the record.

As observed by Mr. Justice Stewart in *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973),

> . . . the question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion.

Both such concerns were fully accommodated here. The need of the airport officials to satisfy themselves that it was safe to accept the luggage for transportation to Miami was altogether compelling. As we did in *Dalpiaz, supra*, 494 F.2d at 378, we approve without repeating the language of Judge Gewin in *United States v. Moreno*, 475 F.2d 44, 49 (5th Cir.), *cert. denied*, 414 U.S. 840, 94 S.Ct. 94, 38 L.Ed.2d 76 (1973). Coercion was altogether lacking here. There is nothing to indicate that Freeland could not have withdrawn the baggage. There appears to have been nothing threatening in the conduct of the persons involved. The occurrence took place in the public areas of the airport. Freeland was not arrested or even personally restrained until after the bag had been opened and a police officer had been summoned.

It is true that, unlike *Dalpiaz*, Freeland's baggage was to be checked through and was not to accompany him inside the passenger compartment, where the bag's contents might have posed the threat of direct use. The risk remained, however, that stored baggage could hold explosives or other material posing danger to the craft, given today's sophistication in their use.

A respect for the very real obligation of the airlines to protect the passengers entrusted to their care demands that the reasonableness of their conduct be measured against the very real risks they seek to avoid. As long as Freeland could have freely withdrawn his baggage from the flight and avoided the search, we see no impediment in holding that his failure to do so amounted to a consent to the search.

Affirmed.