**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**David HARTZOG, Defendant–Appellant.**

**No. 92–5414.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 2, 1992.

Decided Jan. 12, 1993.

OPINION

LUTTIG, Circuit Judge:

Defendant appellant Hartzog was convicted on five related firearms charges. On appeal, he challenges both his sentence and the sufficiency of the evidence to sustain his conviction under count five. Finding no error, we affirm.

### I.

Three separate purchases of firearms are at issue in this appeal. On October 23, 1990, in Chesterfield County, Virginia, Wanda Bowman purchased three guns on behalf of Hartzog because Hartzog, a non-Virginia resident, could not purchase firearms from federally licensed dealers in that state. Shortly after this transaction, agents from the federal Bureau of Alcohol, Tobacco and Firearms approached Bowman, who agreed to cooperate with them. On May 23, 1991, Bowman purchased an additional seven guns on Hartzog's behalf at his request. Finally, on November 17, 1991, Bowman, acting with the approval of the ATF agents, purchased another seven guns on Hartzog's behalf. After Bowman delivered these last guns to Hartzog, the ATF agents followed Hartzog to his motel room and then to the train station, where Hartzog, still carrying the guns, planned to board a New York bound train. The agents arrested him as he stepped onto the step of the train.

Hartzog was charged under a five count superseding indictment. Count one alleged a conspiracy to make the first purchase, in violation of 18 U.S.C. § 371, and count two alleged the purchase itself, in violation of 18 U.S.C. § 924(a)(1)(A). Counts three and four charged Hartzog with the second and third purchases, respectively, also in violation of 18 U.S.C. § 924(a)(1)(A). Count five alleged a violation of 18 U.S.C. § 922(e), delivery of firearms to a common carrier.[1] The jury convicted Hartzog on all counts.

Robert James Wagner, Richmond, VA, argued for defendant-appellant.

Nicholas S. Altimari, U.S. Attorney's Office, Richmond, VA, argued (Richard Cullen, U.S. Atty., Stephen W. Miller, Asst. U.S. Atty., and James Reynolds, Third Year Law Student, on brief), for plaintiff-appellee.

Before RUSSELL and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

---

1. That section reads in relevant part:
   It shall be unlawful for any person knowingly to deliver or cause to be delivered to any common or contract carrier for transportation or shipment in interstate or foreign commerce, to persons other than licensed importers, licensed manufacturers, licensed dealers, or licensed collectors, any package or other

On appeal, Hartzog first argues that he did not "deliver" the firearms to the common carrier within the meaning of section 922(e) and therefore that the evidence was insufficient to sustain his conviction on this count. Second, he argues that the district court erred by not sentencing him on each count under the United States Sentencing Guidelines in effect at the time of the offense charged in each individual count. Finally, in a related argument, Hartzog maintains that the district court improperly applied the manager enhancement of U.S.S.G. § 3B1.1(c) to counts three through five, which alleged offenses that were committed by Hartzog after Bowman and he were no longer engaged in a conspiracy. We address his three assignments of error in turn.

## II.

Hartzog relies—in the absence of a statutory definition—on the definition of "delivery" in Black's Law Dictionary (6th ed. 1990) in support of his contention that he did not "deliver" the firearms to the common carrier. "Delivery" is defined in *Black's* as "[t]he act by which the res or substance thereof is placed within the actual or constructive possession or control of another." *Id.* at 428. He then argues that "[i]n order to constitute a delivery of goods to a carrier for transportation, complete control of them must be given to the carrier; i.e. the owner must not retain any manner of control over the goods." Appellant's Br. at 10.

We find no authority for Hartzog's contention that Congress intended so narrow a meaning of the term "deliver." Hartzog cites in support of his interpretation *Gulf C. & S.F. Ry. Co. v. Lowery*, 155 S.W. 992, 993 (Tex.Civ.App.1913). That case, however, is inapposite to an inquiry into the meaning of the statutory term "deliver." The underlying suit in *Lowery*—a claim by a shipper against a railroad for damages resulting from the railroad's failure to ship

certain cargo—was civil in character and did not turn on the meaning of section 922. Nor are we aided by cases such as *United States v. Garcia Vazquez*, 777 F.2d 494 (9th Cir.1985). In *Garcia Vazquez*, the Ninth Circuit affirmed a conviction under section 922(e) where the defendant had actually relinquished control over his luggage to a common carrier. The Court of Appeals, however, did not hold that the relinquishment of control was required under section 922; it simply held that relinquishment of control (coupled with failure to provide notice) was sufficient to constitute "delivery" within the meaning of the section.

No court construing section 922 has required complete surrender of control as a condition of liability. Indeed, the language of the section, which provides that "any passenger who owns or legally possesses a firearm being transported aboard any common ... carrier may deliver said firearm ... into the custody of the ... conductor ... for the duration of the trip without violating any of the provisions of this chapter" contemplates, by negative inference, that retention of control of a firearm while aboard a common carrier would constitute delivery and thus a violation of the section, assuming the other elements of the offense were satisfied. Furthermore, if relinquishment of control were required, arms traffickers could escape the ambit of the statute merely by retaining possession of the contraband while aboard the carrier. Such could not have been Congress' intent. *See, e.g., United States v. Williams*, 485 F.2d 1383, 1385 (4th Cir.1973) ("[T]he entire statutory scheme is aimed at restricting the unchecked movement of firearms and ammunition which undermines legitimate efforts to impose reasonable restrictions upon their possession and use."), *cert. denied*, 416 U.S. 941, 94 S.Ct. 1947, 40 L.Ed.2d 293 (1974). We conclude, therefore, that one need not relinquish all control over the firearms or ammunition to the

container in which there is any firearm or ammunition without written notice to the carrier that such firearm or ammunition is being transported or shipped....

18 U.S.C. § 922(e). Hartzog does not contend that he provided written notice of the transport of firearms to the carrier.

common carrier in order to effect a "delivery" under section 922.

■ We also reject as inconsistent with the plain meaning of the term "deliver" Hartzog's argument that in order for there to be delivery, a defendant must cross a threshold into the interior of a cabin of the carrier while in the possession of the firearm. A delivery of a firearm is effectuated as much when it is placed upon or affixed in some way to an exterior appurtenance or when it is surrendered to carrier employees for loading,[2] as when it is carried into the interior cabin of a carrier.

■ The question remains, of course, having rejected appellant's arguments that there can be no "delivery" without relinquishment of control or entry into the interior of the carrier, whether in this case there were sufficient facts to support a conclusion that a "delivery" occurred. There are very few reported cases construing the "delivery" requirement of section 922(e) and no cases interpreting that requirement where, as here, the defendant neither actually relinquished control of the firearms to the carrier nor entered into the cabin of the common carrier. We believe, however, that this question must be answered in the affirmative. We conclude, and so hold, that at least where one, while in the unreported possession of a firearm, comes into physical contact with a carrier during the act of boarding that carrier, he can be said to have delivered the firearms to the carrier for transportation within the meaning of section 922(e).

■ Here, while carrying firearms in bags slung across his back, Hartzog stepped from the platform, physically thrust himself up and toward the train and rested one, if not both, of his feet on the step of the train.[3] Under these circumstances, a rational trier of fact could have found Hartzog guilty of delivering firearms to a common carrier for transportation in violation of 18 U.S.C. § 922(e), given that he had not notified the carrier of the delivery.[4] We therefore decline to reverse

**2.** Courts have regularly either expressly affirmed convictions under section 922 or allowed such convictions to stand where the firearms were checked for loading and the passenger neither boarded nor came into physical contact with the carrier, *see, e.g., United States v. Udofot,* 711 F.2d 831 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983) (section 922 violated where defendant checked baggage subsequently determined to contain firearms; defendant arrested as he entered jetway to aircraft); *United States v. Freeland,* 562 F.2d 383 (6th Cir.), *cert. denied,* 434 U.S. 957, 98 S.Ct. 484, 54 L.Ed.2d 315 (1977) (section 922 violation where firearm discovered during x-ray and subsequent hand search of baggage defendant attempted to check at airline counter; passenger arrested in screening area); *United States v. Echols,* 477 F.2d 37 (8th Cir.), *cert. denied,* 414 U.S. 825, 94 S.Ct. 128, 38 L.Ed.2d 58 (1973) (luggage containing firearm loaded onto carrier and delivered to destination; passenger arrested after arriving on subsequent flight), and where the firearm was never loaded onto the carrier but the passenger boarded and traveled to its destination, *see United States v. Henry,* 615 F.2d 1223 (9th Cir.1980) (section 922 violation where defendant surrendered briefcase containing firearm at departure gate prior to boarding, but traveled aboard aircraft to its destination, where he was arrested).

**3.** Agent Moran testified as follows:
My recollection is I grabbed him as he was stepping up, and had stepped on to the first step.... Whether or not he had both feet on that step, I don't know.

\* \* \* \* \* \*

My recollection is, my clear recollection is he had one foot on that train and was boarding it.... I don't recall, and I can't say that he had both feet on there.

\* \* \* \* \* \*

Oh, I pulled him down [from the step]. I know I pulled him down. I reached up. He is quite tall to begin with, and he was much taller as he was up on to that step. And I reached up and pulled him, and he came down.
J.A. at 118–119.

**4.** Section 922 also makes it an offense to *"cause to be delivered ...* any package or other container in which there is any firearm...." (Emphasis added). On these facts, a reasonable jury also could have found that Hartzog caused the firearms to be delivered to the carrier by the act of stepping onto the step of the train. *See supra* note 2. Defense counsel contended at argument that while this portion of the statute would be violated by standing on a caboose platform while in possession of a firearm, it would not be violated by riding on the train steps. We can discern no distinction in principle between the two circumstances. If the firearms were "caused to be delivered" in the one instance, as counsel conceded, it would seem to follow that they were "caused to be delivered" in the other.

appellant's conviction under count five of the indictment.

## III.

■ Applying the November 1991 version of the Guidelines, the district court sentenced Hartzog to serve forty-six months on count one of the indictment and thirty-seven months on each of counts two through five, all sentences to run concurrently. Although generally courts are to rely on the version of the Guidelines in effect at the time of sentencing, *see, e.g., United States v. Aymelek,* 926 F.2d 64, 66 n. 1 (1st Cir.1991) ("Barring *ex post facto* concerns, the guidelines in effect at the time of sentencing, not those in effect when the crime was committed, control at sentencing."), Hartzog argues that reliance on the 1991 version of the Guidelines to sentence him for crimes he committed prior to the effective date of those Guidelines violates the *Ex Post Facto* clause of the Constitution[5] because that version dictated a harsher sentence on those counts than would have been imposed had the district court relied upon the Guidelines in effect at the time of the various offenses. *See Miller v. Florida,* 482 U.S. 423, 431–32, 107 S.Ct. 2446, 2451–52, 96 L.Ed.2d 351 (1987) (*Ex Post Facto* clause precludes application of a state sentencing guideline amendment that was enacted after the date of the defendant's offense and increased the range of imprisonment for the type of offense committed.); *United States v. Morrow,* 925 F.2d 779, 782–83 (4th Cir.1991).

We decline to reach this issue because it was not raised below at Hartzog's sentencing hearing. *See* J.A. at 199–212; *see also,*

*e.g., Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). While Hartzog did note at that hearing that the offenses charged under the different counts occurred while different versions of the Guidelines were in effect, J.A. at 200–02, he did so only in the context of arguing that the enhancement for a managerial role should not apply to all counts, *see infra* Part IV.[6]

## IV.

■ Hartzog also asserts that the district court improperly enhanced his sentence on counts three through five because he no longer was acting as a manager or supervisor at the time he committed the offenses underlying those counts. *See* U.S.S.G. § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity ..., increase by 2 levels."). Even assuming that Hartzog was no longer acting as a manager or supervisor when he committed those offenses, an assumption that is in some doubt at least with respect to count three, his argument is nonetheless without merit. The managerial enhancement does not apply to the sentence imposed on individual counts. Rather, it is applied to determine the applicable sentencing range for the grouped offenses collectively.

■ Hartzog was convicted of multiple related offenses, the last two of which occurred after the effective date of the version of the Guidelines under which he was sentenced, and as a result, those Guidelines were properly applied.[7] Under the Guide-

---

**5.** "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3.

**6.** We note the irony that Hartzog can make this argument on appeal only because of the fortuity of his conviction on counts one through three. Had he not been convicted on these counts, the conduct underlying the counts would have constituted relevant conduct to his conviction on count four, *see* U.S.S.G. § 1B1.3(a)(2), and the sentencing range on that count under the November 1991 Guidelines, which Hartzog does not dispute should apply to count four, *see* Appellant's Br. at 14, would embrace the forty-six month sentence imposed by the district court.

Because he was convicted on counts one through three, however, section 1B1.3(a)(2) was unavailable to the district court. *See United States v. Lancaster,* 968 F.2d 1250, 1257 n. 9 (D.C.Cir.1992) ("[S]ection 1B1.3(a)(2) appears to have been designed to permit consideration only of offense conduct of which a defendant has *not* been convicted....").

**7.** *Cf. United States v. David,* 940 F.2d 722, 739 (1st Cir.1991) ("It is well established that the guidelines apply to a defendant whose offense begins before the guidelines' effective date and continues after the effective date."), *cert. denied,* —— U.S. ——, 112 S.Ct. 2301, 119 L.Ed.2d

lines scheme, related offenses, whether or not they were completed before the new guidelines became effective, are grouped together and a single sentencing range for all of the grouped offenses determined based upon the formula set forth in U.S.S.G. §§ 3D1.1–3D1.5, 5G1.2. In essence, as the commentary to the Guidelines explains, all of the counts that are grouped together are treated as constituting a single offense for purposes of sentencing.[8] The district court did not err.

## CONCLUSION

For the reasons set forth above, the judgment of the district court is affirmed.

AFFIRMED.

224 (1992); *id.* at 740 ("Where, as here, a defendant is convicted of participation in a conspiracy which extends past the effective date of the guidelines, the guidelines take into account the entirety of the defendant's behavior in furtherance of the conspiracy."); *United States v. Cusack,* 901 F.2d 29, 32 (4th Cir.1990) (Pre–Guidelines criminal activity is relevant conduct for a Guidelines sentence.); *United States v. Ykema,* 887 F.2d 697, 700 (6th Cir.1989) (same), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990). *See generally* V United States Sentencing Commission, *Questions Most Frequently Asked About the Sentencing Guidelines* Question 71b, at 19–21 (March 1, 1992) ("[E]ven in a complex case involving multiple counts that occurred under several different versions of the *Guidelines Manual,* it should not be necessary to use more than two Manuals to determine the applicable guideline range—the Manual in effect at the time the last offense was completed and the one in effect at sentencing (if different from the former).").

**8.** The Sentencing Commission, in the Introductory Commentary to Part D of Chapter Three of the Guidelines, entitled "Multiple Counts," de-

scribed this grouping process and characterized its effect as follows:

> This Part provides rules for determining a single offense level that encompasses all the counts of which the defendant is convicted. The single, "combined" offense level that results from applying these rules is used, after adjustment pursuant to the guidelines in subsequent parts, to determine the sentence....

> \*  \*  \*  \*  \*  \*

> Some offenses that may be charged in multiple-count indictments are so closely intertwined with other offenses that conviction for them ordinarily would not warrant increasing the guideline range. For example, embezzling money from a bank and falsifying the related records, although legally distinct offenses, represent essentially the same type of wrongful conduct with the same ultimate harm, so that it would be more appropriate to treat them as a single offense for purposes of sentencing....

> \*  \*  \*  \*  \*  \*

> *In essence, counts that are grouped together are treated as constituting a single offense for purposes of the guidelines.*

U.S.S.G. Ch. 3, Pt. D, intro. comment. (November 1991) (emphasis added).