**UNITED STATES of America**

v.

**Gregory Charles KRUG.**

No. 3:98–00138.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 15, 1999.

---

U.S.C. § 5861(d)); transporting firearms on aircraft without written notice (18 U.S.C. §§ 922(e), 924(a)(1)); and transporting firearms with intent to commit murder (18 U.S.C. § 924(b)). (Superseding Indictment, Docket No. 24).

Through the pending suppression Motion, Defendant argues that evidence seized by the Government during a search of Defendant's suitcase at the airport, and during a search of the Defendant's briefcase at a police property room, should be suppressed because the searches violated the Fourth Amendment.

At the hearing, the Government called Janet Woerner a ticket agent for American Airlines who testified that while she was working at the ticket counter on October 10, 1998, she was approached by the Defendant. Although her testimony was not consistent on the point, airline records indicate that Ms. Woerner issued a bag tag for Defendant's luggage, indicating that Defendant's suitcase was checked for loading onto the plane, and that she issued a boarding pass for the Defendant. (Transcript of Suppression Hearing Held on December 29, 1998, at 42–43, 216–17 (Docket No. 53) [hereinafter "Transcript"]; Exhibit 2).

The Government offered as an exhibit a sign Ms. Woerner testified was on top of the ticket counter on the day of the search. The sign states:

BAGGAGE ALERT

FROM NOW UNTIL YOU BOARD
THE AIRCRAFT, PLEASE DO
NOT ACCEPT ANY ARTICLES
FROM ANYONE OR LEAVE
YOUR BAGS UNATTENDED AT
ANY TIME.

DUE TO HEIGHTENED
SECURITY AT ALL AIRPORTS IN
THE UNITED STATES, PUERTO
RICO, ST. THOMAS AND ST.
CROIX, ALL BAGGAGE BOTH
CHECKED AND CARRY–ON,
IS SUBJECT TO SEARCH

(Exhibit 9). Although it was not offered as an exhibit, Ms. Woerner testified that another sign located on the side of the bag well,

Lionel R. Barrett, Jr., Nashville, TN, for plaintiff.

Sam Delk Kennedy, Jr., Nashville, TN, for defendant.

*MEMORANDUM*

CAMPBELL, District Judge.

### I. *Introduction*

Pending before the Court is Defendant's Motion To Suppress Evidence (Docket No. 28). The Court held a hearing on this Motion on Tuesday, December 29, 1998. For the reasons set forth below, the Court DENIES the Defendant's Motion To Suppress.

### II. *Procedural and Factual Background*

Defendant Krug has been charged with possessing an unregistered firearm (26

the platform where checked luggage is handed to the ticket agent, has the heading "Transportation of Firearms" and states "FAA regulations require that firearms be checked, declared and unloaded. Failure to declare or travel with loaded firearms are subject to civil penalties of $10,000." (Transcript, at 24). Ms. Woerner also testified that the area around the signs was well illuminated on the day of the search. (Transcript, at 214–17). She said that 50 inches above the sign on the counter, there are four, four-foot long, 60–watt, fluorescent bulbs that shine down on the counter. (*Id.*)

Ms. Woerner testified that, as required by federal regulation, she asked the Defendant two security questions. First, she asked the Defendant whether he had received any items from an unknown person, and he said no. (Transcript, at 21, 22, 34–35). Ms. Woerner testified that in answer to the second question, have any of the items you are carrying with you been out of your immediate possession from the time you packed them, the Defendant stated: "The bomb was in the bag yesterday" or "No, the bomb was in the bag yesterday, not today." (Transcript, at 21, 22, 34–35, 53). Ms. Woerner testified that she said, "excuse me," and then proceeded to the back room to find her supervisor.

After contacting her supervisor and requesting his presence, Ms. Woerner went back to the ticket counter, and told the Defendant: "Mr. Thomas, my supervisor, is coming up here and he is going to take you to security to have your bags searched." (Transcript, at 27, 28). She said the Defendant said he was tired and had not slept all night, and that neither of them spoke after that. (Transcript, at 28, 37). Ms. Woerner testified that when her supervisor, Donald E. Thomas, arrived six to eight minutes later, she handed him the Defendant's ticket, and he went with the Defendant to the security checkpoint. (*Id.*)

Mr. Thomas testified that after Ms. Woerner contacted him and told him that a customer made a comment about a bomb being in his bag, he notified the security check point personnel that he would be bringing someone for a "dump search," which Mr.

Thomas explained is a physical search of the contents of the bag. (Transcript, at 64–65). When he arrived at the ticket counter, Mr. Thomas said he asked the Defendant to follow him over to the check point. (Transcript, at 65–66). Mr. Thomas testified that a bag tag was strapped to the handle of the bag, indicating that it had been checked, and that the Defendant carried the bag to the security check point. (Transcript, at 68, 70). Mr. Thomas had taken the Defendant's ticket from Ms. Woerner and carried it to the security check point. (Transcript, at 70, 84).

At the security check point, Mr. Thomas testified, the Defendant put the bag on the x-ray machine, and Mr. Thomas notified one of the check point personnel that this was the bag to be searched. (Transcript, at 71). While the bag was going through the x-ray machine, the person screening the bag stopped the conveyer belt while the bag was inside the x-ray unit. (Id.) Mr. Thomas testified that the screener eventually resumed the conveyer belt, sent the bag through the machine, and that the bag was placed on a table at the end of the machine. (Transcript, at 72). Mr. Thomas said he then reminded the check point personnel that they needed to do a dump search on the bag, and that they told him they could not open the bag until a LEO, or law enforcement officer, arrived. (*Id.*)

Before an officer arrived, Mr. Thomas testified, the Defendant tapped the bag and said, "I have a weapon in this bag." (Transcript, at 73). Mr. Thomas said when he asked the Defendant why he did not declare the weapon at the ticket counter, the Defendant said, "You didn't ask me." (*Id.*) Mr. Thomas told him it was not his position to ask every passenger whether they have a weapon in their bag, and that he had had two opportunities to declare the weapon, and didn't. (Transcript, at 73–74).

Mr. Thomas testified that the bag was not opened until the law enforcement officer arrived. (Transcript, at 74). According to Mr. Thomas, the bag contained a pistol with a very long barrel, several dowel rods wrapped around the barrel of the gun, a black hose with holes punched in it, a knife, a set of handcuffs, three clips, two of which had ammunition in them, and a box of shells. (Tran-

script, at 75). After some discussion about the dowel rods and the hose, Mr. Thomas testified, the officer asked Mr. Thomas whether the Defendant would be allowed to travel, and Mr. Thomas told him that he would not (Transcript, at 76). Mr. Thomas gave the ticket to the officer, and the Defendant then accompanied the officer to an office at the airport. (Transcript, at 77–78).

Officer Vince Dy, a law enforcement officer for the Metropolitan Airport Authority, testified that on the day in question, he was called to the security check point, and upon his arrival, spoke with the head security screener and Mr. Thomas. (Transcript, at 97). Officer Dy testified that the Defendant's bag was already open and that a firearm was visible. (Transcript, at 97–98, 110). After physically searching the bag and discovering a knife, homemade silencer and other items, Officer Dy and another officer detained the Defendant and took him to the their airport office. (Transcript, at 98–99). The officers then arrested the Defendant and charged him with violations of state law. (Transcript, at 99, 101–02).

After examining the Defendant's briefcase to ensure that no weapons were inside, Officer Dy and another officer, Officer Adams, transported the Defendant, the suitcase, the briefcase, and the other seized items to the Metropolitan Police Department jail. (Transcript, at 102–05). At the jail, the officers turned the suitcase, briefcase and other seized items into the police department's property room. (Transcript, at 105). As required by the property room, Officer Adams, with assistance from Officer Dy, filled out an inventory list before leaving the articles in the property room. (Transcript, at 105–06). According to Officer Dy, the officers did not read the documents in the briefcase, but simply made sure there were no weapons or other contraband inside. (Transcript, at 106–07).

Michael Orsbon, an employee of the Metropolitan Police Department, was assigned to and working in the Department's property room on the day Officer Dy and Officer Adams brought the items seized from the Defendant to the property room. Mr. Orsbon testified that before accepting a closed container, the standard operating procedure in the property room is to open the container and verify the inventory list he has been given. (Transcript, at 118; Exhibit 4). Pursuant to that procedure, he made a physical check of Defendant's suitcase and briefcase, which Officers Dy and Adams turned into the property room. (Transcript, at 119–20).

Mr. Orsbon testified that he opened the briefcase and found 10 or 11 manila folders, as well as a micro cassette recorder. (Transcript, at 120). He then proceeded to check the folders to see if they contained anything of value. (Transcript, at 120–21, 124). Upon opening the first folder, Mr. Orsbon testified, his eye was drawn to a handwritten document that discussed killing someone named Fielder, whose name was at the top of the folder. (Transcript, at 121). With regard to this folder, Mr. Orsbon testified: "To be honest with you this was about the second or third page as I popped it up. The pages stopped on my thumb and I kind of looked down and saw it. It is kind of by accident that I even came across it." (Transcript, at 128). Mr. Orsbon said the document he found discussed "getting in someone's house, killing them, ditching the gun, getting on a plane in Nashville and flying back to California." (*Id.*) At that point, Mr. Orsbon testified, he believed that the Defendant may have killed someone, possibly Mr. Fielder, in Knoxville. (*Id.*) Mr. Orsbon contacted the Secret Service because he knew the Vice President was to be in town that day, and the Defendant had possessed a homemade silencer. (*Id.*)

The Defendant's testimony differed from the other witnesses in several respects. The Defendant testified that while checking in at the airport, he did not notice the signs described by Ms. Woerner, and said that the area around the signs was not well illuminated. (Transcript, at 171–72). The Defendant testified that at the check-in counter, Ms. Woerner placed a bag tag on his suitcase, and while holding his driver's license, ticket, and boarding pass, asked him three questions. (Transcript, at 135, 151–52). First, she asked him whether anyone had approached him in the airport and tried to get him to bring something on board, and he

answered no. (Transcript, at 135–36, 152). The next question involved whether his luggage had been in his control since it was packed, and he gave the appropriate response. (Transcript, at 136, 152). Then, according to the Defendant, Ms. Woerner asked him whether he was carrying anything illegal or improper. (Transcript, at 137, 152–55). The Defendant testified that he answered: "Not today." (*Id.*) The Defendant testified that he never used the word "bomb." (*Id.*)

He said that Ms. Woerner said nothing, but slammed the cash drawer, and walked around to the back. (*Id.*) Then, according to the Defendant, he was approached by a man, who said "follow me" or "come with me" and "bring your luggage." (Transcript, at 138, 157–59, 163–65). The Defendant testified that the man was holding his ticket and boarding pass, but he is not sure about whether the man held his driver's license. (*Id.*) They walked to the x-ray machine, and the Defendant put the briefcase, then the suitcase on the machine. (Transcript, at 139, 160–62, 167). While the suitcase was in the machine, the Defendant heard one of the employees say "gun." (*Id.*) The Defendant told Mr. Thomas there was a gun in the suitcase, but he does not recall precisely when he made the statement. (Transcript, at 168–69). The Defendant testified that he was then told to open the suitcase, and he did. (Transcript, at 140, 168–71). According to the Defendant, Officer Dy showed up five minutes later, saw the gun, searched the suitcase, and put handcuffs on him. (*Id.*)

### III. *Analysis*

#### A. *The Airport Search*

Defendant first argues that the search of his suitcase at the airport violates the Fourth Amendment. The Government contends that the search falls within the consent exception to the Fourth Amendment's warrant requirement.

For purposes of Fourth Amendment analysis, the Court will assume that the airport employees who were involved in the events leading up to the search of the Defendant's suitcase were state actors. *United States v. Doe,* 61 F.3d 107, 109 n. 3 (1st Cir.1995); *United States v. Davis,* 482 F.2d 893, 897–904 (9th Cir.1973); 14 C.F.R. Parts 107, 108. As for the search itself, the Court is persuaded that it fell within the consent exception to the Fourth Amendment's warrant requirement.

The federal courts have long held that those passengers who approach airport screening devices impliedly consent to the search of their person and their carry-on bags. *See, e.g., United States v. Henry,* 615 F.2d 1223, 1228–29 (9th Cir.1980). As for checked luggage, the Sixth Circuit has held that a defendant also consented to a search of a bag he sought to check on his flight. In *United States v. Freeland,* 562 F.2d 383, 384 (6th Cir.1977), an airline employee became suspicious of the defendant because he met certain elements of a hijacker profile then in use by the airline. The employee advised his supervisor of his suspicions, and after the defendant placed his bag on the weight scale next to the counter, the supervisor told the defendant that his suitcase would have to be x-rayed. *Id.* The supervisor then picked up the suitcase, told the defendant to follow him, and carried the suitcase to, and placed it on, an x-ray machine. *Id.* An operator of the x-ray unit noticed an unidentifiable object in the suitcase, and asked a fellow employee to "hand check it." *Id.* The defendant was then told that the bag would have to be opened, and he shrugged. *Id.* Upon opening the suitcase, a gun was discovered, and the defendant was arrested. *Id.*

The Sixth Circuit determined that the defendant consented to the search by placing his suitcase on the weight scale next to the ticket counter to be checked. 562 F.2d at 385–86. The court pointed out that a sign appeared on the ticket counter advising the defendant that checked bags could be examined, and that he could withdraw the bag. *Id.* The court also discussed the need for airport officials to satisfy themselves that checked bags do not hold explosives or other material posing danger to the aircraft:

> A respect for the very real obligation of the airlines to protect the passengers entrusted to their care demands that the reasonableness of their conduct be measured against the very real risks they seek

to avoid. As long as Freeland could have freely withdrawn his baggage from the flight and avoided the search, we see no impediment in holding that his failure to do so amounted to a consent to the search.

562 F.2d at 386.

■ In this case, the evidence indicates that a clearly visible sign was located at the check-in counter advising passengers that "all baggage both checked and carry-on, is subject to search." (Exhibit 9). Although the Defendant may not have actually read the sign on the day in question, he does not dispute its existence. (Transcript, at 171–72). Valid consent does not require proof that the Defendant knew he could refuse consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). As the court stated in *Freeland:*

> Coercion was altogether lacking here. There is nothing to indicate that Freeland could not have withdrawn the baggage. There appears to have been nothing threatening in the conduct of the persons involved. The occurrence took place in the public areas of the airport. Freeland was not arrested or even personally restrained until after the bag had been opened and a police officer had been summoned.

562 F.2d at 386.

Even if the Defendant did not consent to the search of his suitcase, the Court is persuaded that the search did not violate the Fourth Amendment. The Defendant's detention at the x-ray machine and the search of his suitcase was reasonable under the principles articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry* and its progeny, certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime:

> Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to

arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.

88 S.Ct. at 1883. *See also Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). The seizure "must be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." 103 S.Ct. at 1325–26.

The Sixth Circuit has applied *Terry* in determining that airport security personnel were justified in asking a defendant to empty his pockets after certain actions aroused their suspicions. *United States v. Dalpiaz*, 494 F.2d 374 (6th Cir.1974). In *Dalpiaz*, the court pointed out that prior to the search, the security guard knew that the defendant held a one-way ticket, had no checked baggage, had in his possession a pistol and a knife with a large blade (which he was told he would not be able to carry on the plane), and had activated the metal detector three times. 494 F.2d at 377–78. Although the officer testified he was not in fear for his own safety, the court noted that one of his duties was to protect other passengers and members of the public who used the airport facilities. *Id.See also United States v. Homburg*, 546 F.2d 1350, 1352–53 (9th Cir.1976) (warrantless physical search of suitcase was justified under *Terry* based on defendant's suspicious behavior leading airport security personnel to believe that he might be carrying a bomb).

■ In this case, the Court concludes that the x-ray search of the Defendant's suitcase was justified by the Defendant's statement to Ms. Woerner that "the bomb was in the bag yesterday." Although Defendant denies making this statement, the Court credits the testimony of Ms. Woerner on this issue. First, there is no apparent motive for Ms. Woerner to lie about this statement. Second, and more importantly, although Ms. Woerner could not recall certain other details about the incident, she told Mr. Thomas,

immediately after the statement had been made, that the Defendant had made a comment about a bomb being in his bag.

Given the possibility that the Defendant could be carrying a bomb or other dangerous device, Ms. Woerner, on behalf of the airline, was justified in conducting a limited search of the suitcase to dispel that suspicion. As the *Dalpiaz* court explained, the airlines and airport security personnel have a legitimate concern about the safety of passengers. At the very least, the airline was justified in making an x-ray search of the suitcase, which is a limited search designed to detect for guns and explosives. *United States v. Henry,* 615 F.2d 1223, 1228 (9th Cir.1980).[1]

 The subsequent physical search of the suitcase was justified by the x-ray scan's suggestion of a gun in the suitcase, and the Defendant's statement that he had a gun in his suitcase.[2] At that point, the airport law enforcement officer was justified, either under *Terry* or because exigent circumstances existed, in searching the suitcase without taking the time to obtain a warrant in order to determine whether the contents of the bag presented a threat to the safety of people in the airport. *United States v. Sarkissian,* 841 F.2d 959, 961–64 (9th Cir.1988) (Exigent circumstances supported warrantless search of bag to determine if it contained explosives in light of information that a bomb was possibly being transported from Los Angeles). The physical search of the bag was reasonable based on the Defendant's comment about a bomb and his statement that a gun was in the bag.[3] As the Court stated in *Terry:* "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and

presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm." 88 S.Ct. at 1881.

Accordingly, the Court concludes that the search of the Defendant's suitcase did not violate his Fourth Amendment rights.

### B. *The Search in the Property Room*

 Defendant also argues that the search of his briefcase in the property room of the Metropolitan Police Department violates the Fourth Amendment. The Government argues that the search was a legitimate inventory search, which is an exception to the Fourth Amendment's warrant requirement.

 The Supreme Court has held that law enforcement officers may make a warrantless inventory search of a defendant's property if the search is conducted according to standardized criteria or established routine, and on the basis of something other than suspicion of criminal activity. *Florida v. Wells,* 495 U.S. 1, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). The search must not be a "ruse for a general rummaging in order to discover incriminating evidence." *Id.* (quoting *Colorado v. Bertine,* 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987)). Inventory searches "serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Id.* The Court has stated that "[a] police officer may be allowed sufficient latitude to determine whether a

---

1. Although Mr. Thomas testified that it was his intent to conduct a full physical search of the suitcase after the Defendant made the statement about the bomb, that search did not actually occur until after the x-ray machine indicated that the bag contained a weapon, and the Defendant stated that the bag actually contained a weapon.

2. Although the Defendant could not recall when he made this statement, he does not deny that he made it, and it is reasonable to assume he would have made the statement before the suitcase was opened and the gun immediately visible. (Transcript, at 168–69). The Defendant testified that

the gun was "[r]ight on top. You couldn't miss it." (Transcript, at 170).

3. Other courts have upheld the validity of physical searches of carry-on bags after an x-ray scan discloses a suspicious or unidentifiable object. *See, e.g., United States v. Smith,* 643 F.2d 942, 944–45 (2d Cir.1981). Although Defendant's suitcase was not to be carried with him on the plane, the possibility that it contained a bomb or other dangerous device presented a risk to people in the airport itself, and if loaded into the cargo hold of the plane, to the plane's passengers.

particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.*

In this case, there is evidence that Mr. Orsbon, who was assigned to the property room, was acting pursuant to a pre-existing policy. (Exhibit 4). That policy requires the person receiving property into the property room to "[v]erify[ ] the presence of all property listed, as well as any other reports/forms that may be required for further processing ..." *(Id.)* Thus, the search of the briefcase by Mr. Orsbon was conducted pursuant to standardized criteria and established routine.

As he testified, Mr. Orsbon was checking the briefcase to verify the inventory list given to him by Officers Dy and Adams. He specifically looked through the manila folders in the briefcase to determine whether they contained anything of value. It was reasonable for Mr. Orsbon to check the files for cash or other items of value to insure against potential claims by the Defendant that the Department lost, stole or otherwise damaged any property he had in the briefcase.

Defendant suggests that Mr. Orsbon did not need to search the briefcase because Officers Dy and Adams had already submitted an inventory list. But the policy described above requires verification by property room personnel, and in this case, it was entirely reasonable for Mr. Orsbon to verify an inventory list that was submitted by an officer who was not employed by the Metropolitan Police.[4]

Furthermore, the Court is persuaded that Mr. Orsbon did not engage in a general rummaging of Defendant's briefcase. The Court credits Mr. Orsbon's testimony that he only noticed the document concerning Mr. Fielder because, as he was looking through the file, "the pages stopped on my thumb."

Accordingly, the Court concludes that the search of Defendant's briefcase by Mr. Orsbon falls within the inventory search exception to the Fourth Amendment's warrant re-

quirement. Defendant's Motion To Suppress is DENIED.

It is so ORDERED.

---

4. The Court notes that a claim for lost or stolen items contained in Defendant's briefcase would not necessarily have been limited to Officers Dy and Adams and the Metropolitan Airport Author-

ity, but could also have been made against the Metropolitan Police Department's property room personnel.